IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RANDY JOE SKAINS,

    Petitioner,                   No. CIV S-06-0127 LKK GGH P

   vs.

JAMES YATES, et al.,

    Respondents.              ORDER

_____/

Introduction and Summary

      Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2001 conviction for second degree murder. Petitioner is serving a sentence of 45 years to life.

      Pending before the court is petitioner's February 25, 2008, motion for leave to conduct discovery. On April 24, 2008, a hearing was held regarding petitioner's motion. Stephanie Adraktas appeared on behalf of petitioner. Barton Bowers appeared on behalf of respondent.

      Petitioner requests that he be permitted to depose prosecutor Brent Redelsperger. The court has taken some time with this discovery motion in that the post-trial deposition of the

1

prosecutor is not an event which should be routinely authorized. More importantly, the result of this discovery motion foretells the disposition of several claims in the operative petition on their merits. A thorough discussion is necessary at this time.

Pared to its essence, petitioner claims that the prosecutor, in rebuttal, knowingly produced false rebuttal testimony on the issue of with whom plaintiff resided in prison, which made it appear that plaintiff had blatantly lied about this fact. The importance of with whom plaintiff resided has some bearing on the merits, such that the impeachment was not entirely collateral to the merits. However, because the undersigned finds from the record that plaintiff suffered insubstantial prejudice as a matter of law, the integrity of the prosecutor is inconsequential to the case.

Discussion

Rule 6(a) of the Federal Rules Governing Section 2254 Cases provides that a habeas petitioner is entitled to discovery "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a).

At the outset, the court addresses respondent's argument in the opposition that petitioner is not entitled to discovery because he failed to develop these facts in state court.

If a petitioner "failed to develop the factual basis for a claim" in state court, the federal court "shall not hold an evidentiary hearing on the claim" unless the petitioner can show that one of two narrow statutory exceptions is applicable. 28 U.S.C. § 2254(d)(2). A request to expand the record with new documentary evidence that is intended to serve the same purpose as an evidentiary hearing is subject to this same rule. Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005); Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736 (2004). The Ninth Circuit has not yet decided whether requests for discovery fall within the ambit of § 2254(e)(2). However, the reasoning of Cooper-Smith and Holland is equally applicable to discovery requests as they are designed to develop evidence on the merits of a claim.

\\\\\

1   If a petitioner "failed to develop the factual basis for a claim" in state court, the
2   federal court "shall not hold an evidentiary hearing on the claim" unless the petitioner can show
3   that one of two narrow exceptions is applicable. 28 U.S.C. § 2254(e)(2). Whether a petitioner
4   failed to develop a claim in state court turns on whether the petitioner exhibited a lack of
5   diligence or some greater fault in state court. Williams v. Taylor, 529 U.S. 420, 421, 120 S.Ct.
6   1479 (2000). Ordinary diligence requires that petitioner seek an evidentiary hearing in state court
7   in the manner prescribed by state law. Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479
8   (2000). Under California law, an appellate court, when presented with a state habeas petition,
9   determines whether an evidentiary hearing is warranted only after the parties file formal
10  pleadings, if they are ordered to do so. Horton v. Mayle, 408 F.3d 570, 582 n.6 (9th Cir. 2005).
11  If the state court denies the petition without ordering formal pleadings, the case never reaches the
12  stage where an evidentiary hearing must be requested and the petitioner's failure to request a
13  hearing in state court does not trigger § 2254(e)(2). Id.
14   In the instant case, petitioner requested an evidentiary hearing in his habeas
15  corpus petition filed in the California Supreme Court. Respondent's Lodged Document 13, p.
16  38. Although petitioner did not request permission to depose the prosecutor, his request for an
17  evidentiary hearing adequately covered this request. The California Supreme Court denied
18  petitioner's state habeas petition raising the at-issue claim without ordering formal pleadings.
19  Because petitioner did not reach the stage of the proceedings at which an evidentiary hearing
20  should be requested, he has not shown a lack of diligence at the relevant stages of the state court
21  proceedings and is not subject to the restrictions set for in § 2254(e)(2).
22   Accordingly, although petitioner's habeas petition is governed by the Anti-
23  Terrorism and Effective Death Penalty Act (AEDPA), which limits a district court's discretion in
24  conducting evidentiary hearings and discovery, see 28 U.S.C. § 2254(e)(2), this court assesses
25  the availability of an evidentiary hearing under pre-AEDPA law because petitioner exercised
26  sufficient diligence in seeking to develop the factual basis of his claim in state court. Wiliams v.

Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479 (2000).

"Under pre-AEDPA law, a habeas petition is entitled to an evidentiary hearing [and discovery] on a claim where the facts are in dispute if 1) he has alleged facts that, if proven would entitle him to relief; and 2) he did not receive a full and fair evidentiary hearing in state court." See Silva v. Calderon, 279 F.3d 825, 853 (9th Cir. 2002).

In Schriro v. Landrigan, ___ U.S. ___, 127 S.Ct. 1933, 1940 (2007), the Supreme Court recently added another consideration in granting evidentiary hearings. The Supreme Court held that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." 127 S.Ct. at 1940. Accordingly, "[i]t follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.

However, Landrigan also recognized that "[i]n cases where an applicant for federal relief is not barred from obtaining an evidentiary hearing under § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court. Id. at 1937. This is so because AEDPA "has not changed" the "basic rule" from before the enactment of AEDPA that "the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts." Id. at 1939.

In the instant case, petitioner did not receive an evidentiary hearing or discovery as to the at-issue claim. Accordingly, the court next considers whether petitioner has alleged facts which, if proven, would entitled him to relief and, pursuant to Landrigan, whether the record refutes his allegations or precludes relief.

In claim two of the amended petition filed August 28, 2007, petitioner argues that the prosecutor knowingly elicited false testimony from a witness in violation of Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177 (1959). Amended Petition, p. 21. A claim under Napue succeeds when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or

4

should have known that the testimony was actually false, and (3) the false testimony was material." Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc).  False testimony is material whenever there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id., at 985.

To put petitioner's motion in its important context, the court sets forth the lengthy factual summary contained in the opinion of the California Court of Appeal.  After independently reviewing the record, the court finds this summary to be accurate.

FACTS

Defendant, Kenneth Miller, Charlotte P., and Charlotte's daughter S.P. were entangled in a complicated web of relationships. Defendant and Charlotte P. considered themselves engaged, though she was still married to and living with Clarence P. Before defendant became engaged to Charlotte P., she had had a relationship with Miller. Defendant and Charlotte P. learned that Miller had molested S.P. According to defendant and Charlotte P., Miller sought retribution against Charlotte and S.P. because S.P. had reported the molestation to the police, and it was partly to forestall this retribution that defendant killed Miller.

Prosecution case

On the evening of July 29, 2000, Butte County Sheriff's Deputy Eric Christopher and his partner arrived at the Southside Mini Market in Oroville, responding to an anonymous tip that someone wanted on an outstanding warrant was there. Defendant, standing near a phone booth, pointed to another man, Kenneth Miller, walking toward a pickup truck. Christopher ran a warrant check on Miller, but it disclosed nothing. The officers left.

Later that night, around 9:15 p.m., Marty Roephler was in the parking lot outside the Shakey's Pizza Restaurant on Olive Highway in Oroville, where he saw a fight between two men. One man (defendant) appeared to be striking the other (Miller). Miller kept backing away from defendant, sometimes putting his hands up in front of his face and asking defendant to stop. He never swung at defendant.

Roephler saw Miller go down on his hands and knees with his forehead on the ground and his hands covering his face. After looking at Miller for about 30 seconds, defendant reached down and put his hand under Miller. Then defendant stood up, walked away, got into a pickup truck, and drove off. Miller crawled a short way.

A woman driving out of the parking lot said to Roephler, "There's a man behind Shakey's. I think he's dead and his guts are hanging out." Roephler found Miller and tried to wrap his abdomen.

Miller died in the hospital on August 1, 2000. A forensic pathologist determined

Miller died of stab wounds and cuts. He had suffered 16 stab wounds. Six, the most severe, were to the abdomen; the others were to his left forehead, his right chest, his hands and arms, the side of his neck, and his chin. He had also suffered six blunt-force injuries, including a large contusion on the back of the head. One of the abdominal cuts, about two and three-fourths inches long, had been made by twisting the knife after it penetrated the abdomen. Any of the abdominal wounds, or the deep cut on the side of Miller's left forehead, could have caused death. The wounds to Miller's hands and arms were probably defensive wounds.

Around 10:00 p.m. on July 29, defendant came to Mark Phelps's house wearing bloody clothes. Defendant said he wanted to clean up, get clean clothes and a gun from Phelps, and "get out of there." Defendant put a hunting knife on his pickup truck and used Phelps's garden hose to clean himself off.

After Phelps got a clean shirt and a firearm, he dialed 911, leaving the phone off the hook. As he went back out, he saw the police arriving and defendant brushing the hunting knife off the truck.

Deputy Christopher, dispatched to investigate the 911 hang up call, recognized defendant's truck from the mini mart. He saw defendant washing himself with the hose. Defendant joked that it looked like the officers were following him.

Phelps told Christopher defendant arrived with blood on him and said he had killed someone. (Not wanting to look like a "rat," Phelps asked Christopher to make Phelps also appear to be a suspect.) Defendant said the blood on his clothes came from cleaning salmon, but Christopher thought there was too much blood for that. Christopher detained defendant, then retrieved the hunting knife from a planter box where Phelps had told him it was.

En route to the county jail, defendant said several times to a deputy: "Off the record, I hope that son of a bitch dies." At the jail, the intake officer overheard defendant saying on the telephone, "Kenny had run into [defendant's] knife a few times" and, "wouldn't be molesting any children ever again"; defendant also said he was looking at 25 years to life, if not death, and would be charged with attempted murder or murder.

Oroville Police Detective Sergeant Mike Wilson interviewed defendant at the jail on the morning of July 30, 2000. Learning the interview would be taped, defendant said he did not want to talk to Wilson. Wilson said they were filing attempted murder charges; defendant asked if it would be only attempted murder because he wished the victim had died. Defendant said Miller had molested a child, S.P., and had "thrown that fact in [defendant's] face."

Oroville Police Detective Richard Robertson found two pocket knives with clean blades in Miller's pants pocket. He also found a can of carburetor spray in the glove compartment of defendant's truck.FN1
[FN1. Defendant relied on this evidence to confirm his story that he stopped the truck on the night of July 29 because of long-standing mechanical problems.]

Detective Robertson interviewed defendant on August 1 and August 3, 2000. Defendant told the following story:

6

On the night of July 29, he was at the Hideaway Bar when Miller walked in. Miller was angry at defendant's girlfriend Charlotte P. because he thought she was involved in the theft of Miller's Harley Davidson motorcycle. Defendant left with Miller to go to the Southside Mini Mart, from which defendant called the police to get Miller arrested.

After that attempt failed, defendant went with Miller to the home of James Campbell, a friend of defendant with whom he had gone fishing that afternoon. Defendant and Miller drank beer there. Both men got more angry and upset as they drank.

Defendant told Detective Robertson in the first interview (though not in the second) that Miller threatened to "get Charlotte and [S.P.]" four or five times in the course of the evening. Defendant also said that when he and Miller were in prison together, Miller had said he would pay defendant to "take care of" Charlotte. Miller did not know about defendant's relationship with her.

After defendant and Miller left Campbell's house, defendant intended to drive Miller home, but developed engine trouble along the way and stopped behind Shakey's. Defendant parked in a secluded spot because he did not want to be arrested for drunk driving.FN2 Miller helped him lift the hood, then hit him on the head from behind. They went to the ground and scuffled. Seeing a knife on the ground, defendant grabbed it and stabbed Miller in the arm or stomach. After that things were "blurry." Miller went down on hands and knees. Defendant got in his truck and drove away.

> [FN2. Breath tests done at 11:25 p.m. on July 29 showed defendant had a blood alcohol level of .14 or .15 percent. However, Campbell testified defendant did not appear drunk when he left Campbell's home. Marty Roephler testified that when he observed the fight both combatants appeared sober. The intake officer at the jail did not smell alcohol on defendant's breath.]

After defendant's arrest he called Campbell and said Campbell's knife was involved in a stabbing. It was Campbell's knife the police found in Phelps's yard.

Defense case

S.P., aged 14 at the time of trial, testified that Miller had begun touching her improperly several years before. She eventually told her parents and the police. The night she told the police, she and her parents went to defendant's house because she was afraid of Miller. One afternoon in July 2000 as she walked home, a friend of Miller's named Fred told her Miller was going to go after her and her family.

Charlotte P. testified that defendant was her fiancé. She had employed Miller in the past as a bodyguard in her taxi business.

In late 1999, Charlotte P. and her husband Clarence P. were living together with their three children, including S.P. The marriage was legal only; she and Clarence P. did not have a "married relationship."

7

One night in that period when defendant was at the P. house, he and Charlotte saw Miller coming out of S.P.'s room. S.P. later told Charlotte and Clarence that Miller was touching her inappropriately and it had been going on for a year. That night Charlotte and S.P. stayed at defendant's house. At some time, someone phoned Charlotte to tell her that Miller had gotten a gun and was coming after her and S.P.

After Miller finished serving time on a probation violation, he went to the P. home, where he said that what the P.s did to him "wasn't cool" and he would get revenge. Charlotte received threatening phone calls. S.P.'s parents sent her to her uncle's house to keep her safe. Charlotte obtained papers for a restraining order against Miller, but did not complete them.

On December 9, 1999, Butte County Sheriff's Detective Victoria Coots interviewed S.P. S.P. identified Miller as the person who had touched her inappropriately.

Detective Coots later interviewed Miller. He told her that Charlotte P. had offered not to press charges as to S.P. if Miller agreed not to press charges against Charlotte P. for embezzlement.

On December 2, 1999, Butte County Sheriff's Deputy Eric Reichel interviewed S.P. at the P. home. S.P. said Miller had been doing it for a year and a half. She did not say he had threatened her. However, Charlotte P. told Reichel that Miller had said he would "take care of" anyone who sent him back to prison. Clarence P. informed Reichel he had heard that Miller had bought a gun.

On the night of defendant's arrest, Clarence P. received defendant's phone call from jail. Defendant sounded "very intoxicated." Clarence P. corroborated the intake officer's account of defendant's words.

Testifying on his own behalf, defendant said S.P. told him on December 6, 1999, that Miller had been molesting her for two years. He took her and Charlotte P. to his home for protection. That night at the Hideaway Bar defendant heard that someone had seen Miller buy a gun; defendant called Clarence P. to tell him. Clarence P. told defendant Miller had made a threatening phone call to him, saying he was going to "get them."

In January 2000, defendant was sent to Deuel Vocational Institute on a parole violation; Miller was there at the time on a probation violation. Ignorant of defendant's relationship with Charlotte P., Miller offered defendant $3,000 plus his Harley Davidson motorcycle to "take care of [Miller's] problem." Defendant, understanding that Miller wanted Charlotte and S.P. murdered, decided to feign interest so as to keep Miller from hiring anyone else.

Defendant broached the subject to Charlotte P. in two letters from prison. In a letter dated January 25, 2000, he said she or Clarence P. should contact the authorities about Miller's threats to hire a killer. In a letter dated June 5, 2000, he said he was worried about S.P.

Defendant was released on July 2, 2000. Almost immediately after, Clarence P.

told him Miller had called Clarence with another threat; Clarence had bought a gun. Defendant also learned that a man named Fred Trask had told S.P. that Miller was out to get her.

On the afternoon of July 29, 2000, defendant went fishing with James Campbell and then alone, drinking alcohol as he fished. FN3 He then went to the Hideaway Bar.

Detective Robertson testified that he found one or two knives in a fishing tackle box in defendant's truck.

Miller came in. Still unaware of defendant's relationship with Charlotte P., Miller said he was angry with her for stealing his motorcycle while he was incarcerated. He asked if defendant had considered Miller's offer to "take care of" Charlotte and S.P.

Defendant and Miller went to the Southside Mini Mart. There, defendant called 911, thinking Miller had an outstanding warrant on the molestation charges. Defendant pointed out Miller to the police when they arrived. Miller pulled two knives out of his pocket and put them in the bed of his truck. After checking Miller's identification and discovering no arrest warrant on him, the officers left. FN4

> [FN4. Defendant admitted he did not tell the officers about Miller's threats, but explained he did not want to be "a rat."]

Though intoxicated, defendant drove Miller to James Campbell's house to borrow money. They continued to drink. At one point Miller went into Campbell's kitchen alone, at which time he could have stolen Campbell's knife.

Wanting to keep Miller away from Charlotte P. and S.P., defendant invited him back to defendant's home. Miller's anger against Charlotte for stealing his motorcycle, and against S.P. for reporting the molestation, seemed to increase.

They left defendant's home in his truck, which soon began to sputter. Defendant pulled into the Shakey's parking lot to fix it. Miller made more threats against Charlotte P. and S.P., saying he would cut " '[t]hose cunts' throats.' " Defendant told him he would have to go through defendant to do it. Miller hit defendant in the back of the head.

A fight ensued. Miller had a knife in his hand. They went down to the ground together. As defendant got up, he saw a knife. He remembered swinging it once at Miller. He remembered little more of the fight. Eventually he left. He did not remember why he went to Marty Phelps's house; nor did he remember asking Phelps for a shirt and a gun. Defendant had not intended to kill Miller, even though he told the police he wished Miller would die.

Mark Larson, a former employer and drinking partner of defendant, testified that defendant called him around 6:00 or 7:00 p.m. on the night of the killing. Defendant's speech was "sloppy," suggesting that he was drunk. (Larson admitted he had never seen defendant drunk.)

A police officer who responded to the scene at Shakey's testified that eyewitness Marty Roephler and his companion described the fight as a "drunken brawl." They said the attacker swung at the other man with a slapping motion.

A private investigator testified that there was a can of carburetor spray in the glove compartment of defendant's truck after his arrest. There was also a diary on the dashboard containing the following entries: "Jan. 8, 00 [ sic ], talked to Kenny Miller. Harley plus 3,000"; "[L]et Char and [S.] know to watch out. Have them contact me ASAP." FN5

> FN5. Defendant testified he wrote these notes on January 8, 2000, after Miller made the offer to pay him for killing Charlotte P. and S.P.]

Michael Jennings, the owner of the truck defendant was driving, testified that it had faulty wiring.

Rebuttal

Detective Robertson testified that he drove defendant's truck 30 or 40 feet after defendant's arrest and found no mechanical problems. Robertson also testified that when he interviewed Charlotte P. shortly after the crime, she said defendant told her on the telephone he had parked behind Shakey's to drink; he also said Miller had knives and he himself had a knife. Finally, Robertson testified that in defendant's detailed account of the stabbing he had never said he saw a knife in Miller's hand, but only on the ground.

Fred Trask, an acquaintance of Miller, testified that Miller told him someone had taken funds out of Miller's account without permission. Trask denied ever telling anyone that Miller was going to get S.P. or Charlotte P.

Miller's parole agent testified that Miller and defendant were in Deuel Vocational Institute at the same time for three weeks in January and February 2000, but were housed in different wings.

Respondent's Lodged Document no. 4, pp. 3-14.

Either during Mills' testimony or immediately thereafter, petitioner's trial counsel received a copy of the records that Mills relied on to find that petitioner and Miller had not been housed together. Amended Petition, Foster declaration, ¶ 4. The court denied counsel's request for a recess to review the records. <u>Id.</u> At that time, counsel could not interpret the records. <u>Id.</u>

In closing argument, the prosecutor argued that petitioner was lying when he testified that he and Miller were housed together at the Deuel Vocational Institute (DVI) and that Miller offered to pay petitioner to kill the Prentice family. RT at 564. The prosecutor suggested that if petitioner lied about whether he was housed with Miller at DVI, the jury should find all of

his testimony incredible.

As the jury deliberated, petitioner asked to see the DVI records relied on by Mills. Id., ¶ 5. Petitioner insisted that the records verified his testimony that he and Miller were housed together. Id. Counsel reviewed the records with Officer Rick Robertson of the Oroville Police Department. Id. Based on that review, it appeared to counsel that petitioner was telling the truth. Id.

Counsel approached the prosecutor as the court was in recess and told him that petitioner had reviewed the housing records and insisted that Mills' testimony was mistaken. Id., ¶ 6. The prosecutor shrugged his shoulders and said he believed Mills over petitioner. Id.

In the pending motion for discovery, petitioner argues that the prosecutor should have known that Mills' testimony was false after petitioner's counsel told him so. Petitioner also contends that the prosecutor had in his own files the computer records Mills relied on. Petitioner argues that even though the jury was deliberating, the prosecutor still could have corrected the record. Petitioner wants to depose the prosecutor in order to find out what he knew while the jury was deliberating and what he did or did not do in response to the information received from petitioner's counsel.

For the following reasons, the court does not find that there is a reasonable likelihood that Mills' testimony affected the judgment of the jury. As discussed by the California Court of Appeal, Marty Roephler testified it appeared to him that petitioner attacked Miller:

> Q: When you say it appeared to be a fight, what did you see?
>
> A: We saw two people facing each other. Men. Obviously they were discussing something, and then looked like one person started slapping the other. As this progressed, they would stop and then he would be slapping him again and it kind of progressed across the parking lot.
>
> ****
>
> Q: Was he striking him with one hand or two?
>
> A: At times two, but primarily one.

1  Q: And was that other person that was being struck trying to fight back?

2  A: He was trying to defend himself.

3  Q: In what way?

4  A: He was constantly putting his arms in front of his face.

5  Q: For the record, you say he put his hands in a crossed fashion above his face; is that correct? In a defensive posture?

6  A: This is correct.

7  Q: Was that anything to do with stopping the aggression? Was he swinging back towards that other person?

8  

9  A: No.

10 Q: Did you ever hear that person being struck say anything?

11 A: Yes.

12 Q: What was he saying?

13 A: In a slightly raised voice he would say, "Quit it. Stop this."

14 RT at 52-54.

15 Roephler testified that every time Miller got slapped, he would move a little bit
16 backward to get away. RT at 55. The fight moved back in this direction about 50 feet. RT at 56.
17 During this time, they would have "little discussions" and then petitioner would start slapping
18 Miller again. RT at 56. During the time the fight moved the 50 feet, Roephler did not see Miller
19 swing at petitioner. RT at 56. When he got to 50 feet, Miller got on his hands and knees with his
20 face on the ground and his hands trying to protect his face. RT at 57. Petitioner stood and
21 looked at him for 30 seconds and then reached down, put his hands underneath him, and then
22 walked away. RT at 58.

23 Paradise Police Officer Rockwell testified that on the night of the murder,
24 Roephler told him that he saw a man standing over another man kneeling on the ground. RT at
25 247. The man standing made a swinging motion with his arm as if he were slapping the man on
26 the ground. RT at 247-248. Roephler told Rockwell that he thought he was watching a drunken

brawl. RT at 248. They heard the man on the ground yelling "stop." RT at 248.

Miller had injuries to his head, abdomen and arm, but his most severe injuries were the stabs wounds in his abdomen. RT at 187. Petitioner had no visible injuries.

Petitioner testified that when he ran into Miller in the bar on the night of the murder, Miller said that his people were going to "get" Charlotte and Stephanie and slit their throats. RT at 381. Petitioner explained that he then left the bar with Miller to "keep tabs on him, try to talk him out of doing anything to Charlotte and Stephanie." RT at 381. After that, they went to the Mini Mart where petitioner called 911 in an attempt to get Miller arrested. RT at 382. When Miller was not arrested, petitioner and he went to Campbell's house. RT at 385. Petitioner asked Campbell if he could borrow $20. RT at 385. Petitioner then talked Miller into going up to his house and drinking a beer to keep him away from Charlotte's house. RT at 387.

As they drove around, petitioner's truck began sputtering. RT at 388. They pulled into the Shakey's parking lot. RT at 388. As petitioner worked to try and fix the truck, Miller kept making threatening statements about Charlotte and Stephanie. RT at 390. Petitioner then turned to side and said that if Miller wanted to get Charlotte and Stephanie, he would have to go through him. RT at 390. Miller then hit him on the back of the head and they started fighting. RT at 390. Petitioner saw a knife in Miller's hand. RT at 391. They were swinging at each other. RT at 391. At one point, petitioner rushed Miller and they both went to the ground. RT at 391. As they got up, petitioner saw the knife on the ground. RT at 392. Petitioner picked it up and swung it at Miller one time. RT at 392. Petitioner could not remember swinging the knife any more times because he "lost contact with reality." RT at 392. The only thing he remembered after that was somebody yelling his knife. RT at 392. At point, he heard someone yelling his name and saw Miller on the ground. RT at 392. Petitioner then left. RT at 392.

The jury received the following instructions regarding self-defense and defense of others:

\\\\\

> The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes, one, there's imminent danger that the person will either kill him or cause him great bodily injury; two that is necessary under the circumstances for him to use in self-defense the force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to himself.  A mere fear of death or great bodily injury is not sufficient to justify a homicide.  To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position and the party killing must act under the influence of those fears alone.  The danger must be apparent, present, immediate and instantly dealt with or must so appear at the time to the slayer as a reasonable person and the killing must be done on the [sic] a well-founded belief that it is necessary to save one's self from death or great bodily injury.
>
> Homicide is justifiable and not unlawful when committed by any person in the defense of himself or another if he actually and reasonably believes that the individual killed intended to commit a forcible and atrocious crime and there was imminent danger of that crime being accomplished.
>
> A person may act upon appearance whether the danger is real or merely apparent.  The reasonable ground of apprehension does not require actual danger but it does require, one, that the person about to kill another be confronted by the appearance of a peril such as had been mentioned; two, that the appearance of peril arose in his mind as actual belief and fear of the existence of that peril and, three, that a reasonable person in the same situation seeing and knowing the same facts would be justified in having the same fear, and four, that the killing be done under the influence of that fear alone.
>
> *****
>
> The right of self-defense is only available to a person who engages in mutual combat if he [h]as done all of the following: He has actually tried in good faith to refuse to continue fighting; he has clearly informed his opponent he wants to stop fighting; he has clearly informed his opponent he has stopped fighting; he has given his opponent the opportunity to stop fighting.  After he has done these four things he has the right to self-defense if his opponent continues to fight.

RT at 509-510, 515.

The jury was also instructed as to imperfect self-defense, i.e., the unreasonable belief in the necessity to defend against imminent peril, which would have resulted in a manslaughter conviction.  RT at 511.

Petitioner believes that his defense were greatly complicated if the jury believed he was a liar about his placement in prison with Miller as a result of Mills' testimony.  That is, if petitioner was not to be trusted in as simple a matter as to whom he resided with in prison, how

could petitioner be trusted in any of his testimony.  Petitioner claims therefore that his "defense of others" and "self-defense" theories were irreparably harmed by the prosecutor's introduction of the Mills' testimony on rebuttal.  While petitioner's assertion has some color in the abstract, upon examination of the facts at trial, petitioner could not have been substantially harmed by Mills' testimony.

Petitioner's defense of others defense was based on his fear that Miller was going to harm Stephanie and Charlotte.  Petitioner had testified that Miller had communicated such threats while petitioner and Miller resided together in prison.  Superficially, petitioner's relating of these threats would be important to an alleged state of mind that petitioner feared for the victims' safety.  However, the context of Miller's death completely defeats any defense of others theory regardless of petitioner's state of mind.  Under California law:[1]

> To support instructions on defense of others, there must have been (1) " 'evidence from which the jury could find that [Ponce] actually had such a belief,' " (Oropeza, supra, 151 Cal.App.4th at p. 82) and (2) evidence that Ponce believed the harm to Hernandez was imminent. "Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice.  The defendant's fear must be of imminent danger to life or great bodily injury. ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with." ... [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an actual fear of an imminent harm. Without this finding, imperfect self-defense is no defense." (In re Christian S., supra, 7 Cal.4th at p. 783.; see also Randle, supra, 35 Cal.4th at pp. 995-996 [same true of imperfect defense of others].)

[see footnote 1]

Clearly, from the facts, the threatened victims were no where near petitioner's and Miller's location at the time of Miller's death.  Defense of others was an impossible defense.  Therefore,

\\\\\

---

[1] The following language is taken from People v. Ponce, 2008 WL 2175305 (Cal. App. 2008).  While this unpublished case cannot be cited as authority, and the undersigned has no intention of doing so, nothing prevents the undersigned from finding the quote an accurate, well stated rendition of California law.  The undersigned adopts it as his own legal conclusion.

15

an attack on petitioner's credibility in asserting the impossible defense was totally inconsequential.

The self-defense theory was not legally impossible under the facts. But, the problem with this second defense vis-a-vis petitioner's testimony – "I resided with the victim when he made threats to the victims" – is that the threat testimony did not directly relate to the self-defense theory. That is, Miller did not threaten petitioner – he threatened others. Although the jury could have disbelieved petitioner's self-defense testimony because he was asserted to be false in his statement about Miller's location in prison and hence, his threats to others, petitioner's impeachment is now much less directly relevant to self-defense than with respect to the defense of others theory. That is, the impeachment becomes collateral to the asserted self-defense. Impeachment on a collateral matter is oftentimes insufficient to establish prejudice if it turns out that the impeachment was inaccurate.

In any event, petitioner's credibility was already severely undercut by the testimony of witness Roephler. Petitioner apparently would have liked the jury to believe that Roephler arrived on the scene after Miller had attacked him, thus warranting stabbing him 16 times, and after he had "lost contact with reality." Regardless of what had happened prior to Roephler's arrival on the scene, Roephler testified that he saw petitioner repeatedly slap Miller, which most likely were actually stabbing motions. Roephler saw Miller back up 50 feet as petitioner continued "slapping him." During this time, Roephler did not see Miller make an aggressive move toward petitioner. Petitioner had not tried in good faith to refuse to continue fighting; he did not clearly inform Miller that he wanted to stop fighting or that he had stopped fighting; and nor did he give Miller an opponent the opportunity to stop fighting. While petitioner may argue that he had already taken these steps before Roephler arrived and then been forced to stab Miller 16 times, this scenario was unbelievable. Petitioner's own lack of injuries also undercut his version of events.

\\\\\

While Mills' testimony challenged petitioner's credibility, there is no reasonable likelihood that this testimony affected the jury's verdict based on the other strong evidence hurting petitioner's credibility.[2] Accordingly, petitioner is not entitled to an evidentiary hearing because even if petitioner could prove that the prosecutor knowingly submitted false testimony, he would not be entitled to an evidentiary hearing. See Silva v. Calderon, supra. If there is to be no evidentiary hearing, the necessity to establish the prosecutor's state of mind via discovery is non-existent.

In addition, after independently reviewing the record, the court finds that the summary denial of this claim by the California Supreme Court in its order denying petitioner's state habeas petition (respondent's lodged document no. 14) was not an unreasonable application of clearly established Supreme Court authority. 28 U.S.C. § 2254(d). For this reason as well petitioner is not entitled to an evidentiary hearing, Landrigan, supra, or discovery.

This court has considered whether to exercise its discretion to hold an evidentiary hearing. Because of the legal impossibility of a "defense of others" theory and because of the strong evidence undermining petitioner's credibility on a self-defense theory, the court declines to exercise this discretion. It follows that no discovery is necessary.

Accordingly, IT IS HEREBY ORDERED that petitioner's February 25, 2008, motion for discovery is denied.

DATED: 06/30/08                    /s/ Gregory G. Hollows
skains.dis                         UNITED STATES MAGISTRATE JUDGE

---

[2] Petitioner suggests that he also may be raising a claim that the prosecutor unwittingly, rather than knowingly, used false testimony. However, the Supreme Court has not held that a prosecutor's good faith or unwitting use of perjured testimony violates due process. In United States v. Young, 17 F.3d 1201 (9th Cir. 1994) the Ninth Circuit found that the good faith use of perjured testimony violated due process if a reasonable possibility existed that, but for the perjured testimony, the result of the proceedings would be different. However, Young does not suffice for established Supreme Court authority. Two district courts have reached this conclusion as well. See Farnese v. Schartz, 2008 WL 2025104, (E.D.Cal. 2008); Austin v. Tilton, 2008 WL 595952 (S.D. Cal. 2008). In any event, a claim pursuant to United States v. Young would fail because there is no reasonable possibility that Mills' testimony affected the outcome of petitioner's trial.