1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RANDY JOE SKAINS, SR.,

11          Petitioner,                    No. CIV S-06-127 LKK CHS P

12      vs.

13   BILL LOCKLER, et al.,

14          Respondents.              FINDINGS AND RECOMMENDATIONS

15   _____/

16                            I.  INTRODUCTION

17          Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. §2254.  Petitioner challenges his 2001 conviction for second

19   degree murder in the Butte County Superior Court, which resulted in a sentence of 45 years to

20   life.  The following exhausted claims are presented in the second amended petition:

21          A.     The prosecutor presented false or misleading witness testimony;

22          B.     The prosecutor improperly coached witnesses;

23          C.     The prosecutor failed to disclose impeachment evidence in violation of
                   *Brady v. Maryland*, 373 U.S. 83  (1963);

24
             D.     The prosecutor made prejudicial, misleading statements to the press prior
25                  to trial;

26          E.     The trial judge was biased due to a conflict of interest;

                                          1

F.      Petitioner was compelled to testify in violation of the Fifth Amendment;

G.      His right to present a complete defense was violated;

H.      The trial judge implied his guilt and denied him a fair trial by commenting in the jury's presence that petitioner was present in custody;

I.      Trial counsel rendered ineffective assistance of counsel;

J.      Petitioner's right to a unanimous jury verdict was violated; and

K.      The prosecutor was biased due to a conflict of interest.

Petitioner's arguments, respondent's opposition, and the trial transcript have been carefully reviewed. For the reasons that appear below, petitioner is not entitled to relief on any of his claims.

## II.  FACTUAL BACKGROUND

The following background facts, including footnotes, were drawn from the unpublished opinion of the California Court of Appeal, Third Appellate District, Case No. C042286:[1]

> Defendant, Kenneth Miller, Charlotte P., and Charlotte's daughter S.P. were entangled in a complicated web of relationships. Defendant and Charlotte P. considered themselves engaged, though she was still married to and living with Clarence P. Before defendant became *engaged* to Charlotte P., she had had a relationship with Miller. Defendant and Charlotte P. learned that Miller had molested S.P. According to defendant and Charlotte P., Miller sought retribution against Charlotte and S.P. because S.P. had reported the molestation to the police, and it was partly to forestall this retribution that defendant killed Miller.
>
> *Prosecution case*
>
> On the evening of July 29, 2000, Butte County Sheriff's Deputy Eric Christopher and his partner arrived at the Southside Mini Market in Oroville, responding to an anonymous tip that someone wanted on an outstanding warrant was there. Defendant, standing near a phone booth, pointed to another man, Kenneth Miller, walking toward a pickup truck. Christopher ran a warrant check on Miller, but it disclosed nothing. The officers left.

---

[1] C042286 opinion is lodged in this record as document 4 (12/11/07).

Later that night, around 9:15 p.m., Marty Roephler was in the parking lot outside the Shakey's Pizza Restaurant on Olive Highway in Oroville, where he saw a fight between two men. One man (defendant) appeared to be striking the other (Miller). Miller kept backing away from defendant, sometimes putting his hands up in front of his face and asking defendant to stop. He never swung at defendant.

Roephler saw Miller go down on his hands and knees with his forehead on the ground and his hands covering his face. After looking at Miller for about 30 seconds, defendant reached down and put his hand under Miller. Then defendant stood up, walked away, got into a pickup truck, and drove off. Miller crawled a short way.

A woman driving out of the parking lot said to Roephler, "There's a man behind Shakey's. I think he's dead and his guts are hanging out." Roephler found Miller and tried to wrap his abdomen.

Miller died in the hospital on August 1, 2000. A forensic pathologist determined Miller died of stab wounds and cuts. He had suffered 16 stab wounds. Six, the most severe, were to the abdomen; the others were to his left forehead, his right chest, his hands and arms, the side of his neck, and his chin. He had also suffered six blunt-force injuries, including a large contusion on the back of the head. One of the abdominal cuts, about two and three-fourths inches long, had been made by twisting the knife after it penetrated the abdomen. Any of the abdominal wounds, or the deep cut on the side of Miller's left forehead, could have caused death. The wounds to Miller's hands and arms were probably defensive wounds.

Around 10:00 p.m. on July 29, defendant came to Mark Phelps's house wearing bloody clothes. Defendant said he wanted to clean up, get clean clothes and a gun from Phelps, and "get out of there." Defendant put a hunting knife on his pickup truck and used Phelps's garden hose to clean himself off.

After Phelps got a clean shirt and a firearm, he dialed 911, leaving the phone off the hook. As he went back out, he saw the police arriving and defendant brushing the hunting knife off the truck.

Deputy Christopher, dispatched to investigate the 911 hang up call, recognized defendant's truck from the mini mart. He saw defendant washing himself with the hose. Defendant joked that it looked like the officers were following him.

Phelps told Christopher defendant arrived with blood on him and said he had killed someone. (Not wanting to look like a "rat," Phelps asked Christopher to make Phelps also appear to be a suspect.) Defendant said the blood on his clothes came from

cleaning salmon, but Christopher thought there was too much blood for that. Christopher detained defendant, then retrieved the hunting knife from a planter box where Phelps had told him it was.

En route to the county jail, defendant said several times to a deputy: "Off the record, I hope that son of a bitch dies." At the jail, the intake officer overheard defendant saying on the telephone, "Kenny had run into [defendant's] knife a few times" and, "wouldn't be molesting any children ever again"; defendant also said he was looking at 25 years to life, if not death, and would be charged with attempted murder or murder.

Oroville Police Detective Sergeant Mike Wilson interviewed defendant at the jail on the morning of July 30, 2000. Learning the interview would be taped, defendant said he did not want to talk to Wilson. Wilson said they were filing attempted murder charges; defendant asked if it would be only attempted murder because he wished the victim had died. Defendant said Miller had molested a child, S.P., and had "thrown that fact in [defendant's] face."

Oroville Police Detective Richard Robertson found two pocket knives with clean blades in Miller's pants pocket. He also found a can of carburetor spray in the glove compartment of defendant's truck.[2]

Detective Robertson interviewed defendant on August 1 and August 3, 2000. Defendant told the following story:

On the night of July 29, he was at the Hideaway Bar when Miller walked in. Miller was angry at defendant's girlfriend Charlotte P. because he thought she was involved in the theft of Miller's Harley Davidson motorcycle. Defendant left with Miller to go to the Southside Mini Mart, from which defendant called the police to get Miller arrested.

After that attempt failed, defendant went with Miller to the home of James Campbell, a friend of defendant with whom he had gone fishing that afternoon. Defendant and Miller drank beer there. Both men got more angry and upset as they drank.

Defendant told Detective Robertson in the first interview (though not in the second) that Miller threatened to "get Charlotte and [S.P.]" four or five times in the course of the evening. Defendant also said that when he and Miller were in prison together, Miller had said he would pay defendant to "take care of" Charlotte. Miller did not know about defendant's relationship with her.

---

[2] Defendant relied on this evidence to confirm his story that he stopped the truck on the night of July 29 because of long-standing mechanical problems.

After defendant and Miller left Campbell's house, defendant intended to drive Miller home, but developed engine trouble along the way and stopped behind Shakey's. Defendant parked in a secluded spot because he did not want to be arrested for drunk driving.[3] Miller helped him lift the hood, then hit him on the head from behind. They went to the ground and scuffled. Seeing a knife on the ground, defendant grabbed it and stabbed Miller in the arm or stomach. After that things were "blurry." Miller went down on hands and knees. Defendant got in his truck and drove away.

After defendant's arrest he called Campbell and said Campbell's knife was involved in a stabbing. It was Campbell's knife the police found in Phelps's yard.

*Defense case*

S.P., aged 14 at the time of trial, testified that Miller had begun touching her improperly several years before. She eventually told her parents and the police. The night she told the police, she and her parents went to defendant's house because she was afraid of Miller. One afternoon in July 2000 as she walked home, a friend of Miller's named Fred told her Miller was going to go after her and her family.

Charlotte P. testified that defendant was her fiancé. She had employed Miller in the past as a bodyguard in her taxi business.

In late 1999, Charlotte P. and her husband Clarence P. were living together with their three children, including S.P. The marriage was legal only; she and Clarence P. did not have a "married relationship."

One night in that period when defendant was at the P. house, he and Charlotte saw Miller coming out of S.P.'s room. S.P. later told Charlotte and Clarence that Miller was touching her inappropriately and it had been going on for a year. That night Charlotte and S.P. stayed at defendant's house. At some time, someone phoned Charlotte to tell her that Miller had gotten a gun and was coming after her and S.P.

After Miller finished serving time on a probation violation, he went to the P. home, where he said that what the P.s did to him "wasn't cool" and he would get revenge. Charlotte received threatening phone calls. S.P.'s parents sent her to her uncle's house to keep her

---

[3] Breath tests done at 11:25 p.m. on July 29 showed defendant had a blood alcohol level of .14 or .15 percent. However, Campbell testified defendant did not appear drunk when he left Campbell's home. Marty Roephler testified that when he observed the fight both combatants appeared sober. The intake officer at the jail did not smell alcohol on defendant's breath.

safe. Charlotte obtained papers for a restraining order against Miller, but did not complete them.

On December 9, 1999, Butte County Sheriff's Detective Victoria Coots interviewed S.P. S.P. identified Miller as the person who had touched her inappropriately.

Detective Coots later interviewed Miller. He told her that Charlotte P. had offered not to press charges as to S.P. if Miller agreed not to press charges against Charlotte P. for embezzlement.

On December 2, 1999, Butte County Sheriff's Deputy Eric Reichel interviewed S.P. at the P. home. S.P. said Miller had been doing it for a year and a half. She did not say he had threatened her. However, Charlotte P. told Reichel that Miller had said he would "take care of" anyone who sent him back to prison. Clarence P. informed Reichel he had heard that Miller had bought a gun.

On the night of defendant's arrest, Clarence P. received defendant's phone call from jail. Defendant sounded "very intoxicated." Clarence P. corroborated the intake officer's account of defendant's words.

Testifying on his own behalf, defendant said S.P. told him on December 6, 1999, that Miller had been molesting her for two years. He took her and Charlotte P. to his home for protection. That night at the Hideaway Bar defendant heard that someone had seen Miller buy a gun; defendant called Clarence P. to tell him. Clarence P. told defendant Miller had made a threatening phone call to him, saying he was going to "get them."

In January 2000, defendant was sent to Duel Vocational Institute on a parole violation; Miller was there at the time on a probation violation. Ignorant of defendant's relationship with Charlotte P., Miller offered defendant $3,000 plus his Harley Davidson motorcycle to "take care of [Miller's] problem." Defendant, understanding that Miller wanted Charlotte and S.P. murdered, decided to feign interest so as to keep Miller from hiring anyone else.

Defendant broached the subject to Charlotte P. in two letters from prison. In a letter dated January 25, 2000, he said she or Clarence P. should contact the authorities about Miller's threats to hire a killer. In a letter dated June 5, 2000, he said he was worried about S.P.

Defendant was released on July 2, 2000. Almost immediately after, Clarence P. told him Miller had called Clarence with another threat; Clarence had bought a gun. Defendant also learned that a man named Fred Trask had told S.P. that Miller was out to get her.

On the afternoon of July 29, 2000, defendant went fishing with James Campbell and then alone, drinking alcohol as he fished.[4] He then went to the Hideaway Bar.

Miller came in. Still unaware of defendant's relationship with Charlotte P., Miller said he was angry with her for stealing his motorcycle while he was incarcerated. He asked if defendant had considered Miller's offer to "take care of" Charlotte and S.P.

Defendant and Miller went to the Southside Mini Mart. There, defendant called 911, thinking Miller had an outstanding warrant on the molestation charges. Defendant pointed out Miller to the police when they arrived. Miller pulled two knives out of his pocket and put them in the bed of [the] truck. After checking Miller's identification and discovering no arrest warrant on him, the officers left.[5]

Though intoxicated, defendant drove Miller to James Campbell's house to borrow money. They continued to drink. At one point Miller went into Campbell's kitchen alone, at which time he could have stolen Campbell's knife.

Wanting to keep Miller away from Charlotte P. and S.P., defendant invited him back to defendant's home. Miller's anger against Charlotte for stealing his motorcycle, and against S.P. for reporting the molestation, seemed to increase.

They left defendant's home in his truck, which soon began to sputter. Defendant pulled into the Shakey's parking lot to fix it. Miller made more threats against Charlotte P. and S.P., saying he would cut " '[t]hose cunts' throats.' " Defendant told him he would have to go through defendant to do it. Miller hit defendant in the back of the head.

A fight ensued. Miller had a knife in his hand. They went down to the ground together. As defendant got up, he saw a knife. He remembered swinging it once at Miller. He remembered little more of the fight. Eventually he left. He did not remember why he went to Marty Phelps's house; nor did he remember asking Phelps for a shirt and a gun. Defendant had not intended to kill Miller, even though he told the police he wished Miller would die.

Mark Larson, a former employer and drinking partner of defendant, testified that defendant called him around 6:00 or 7:00 p.m. on the

---

[4] Detective Robertson testified that he found one or two knives in a fishing tackle box in defendant's truck.

[5] Defendant admitted he did not tell the officers about Miller's threats, but explained he did not want to be "a rat."

night of the killing. Defendant's speech was "sloppy," suggesting that he was drunk. (Larson admitted he had never seen defendant drunk.)

A police officer who responded to the scene at Shakey's testified that eyewitness Marty Roephler and his companion described the fight as a "drunken brawl." They said the attacker swung at the other man with a slapping motion.

A private investigator testified that there was a can of carburetor spray in the glove compartment of defendant's truck after his arrest. There was also a diary on the dashboard containing the following entries: "Jan. 8, 00 [ *sic* ], talked to Kenny Miller. Harley plus 3,000"; "[L]et Char and [S.] know to watch out. Have them contact me ASAP."[6]

Michael Jennings, the owner of the truck defendant was driving, testified that it had faulty wiring.

*Rebuttal*

Detective Robertson testified that he drove defendant's truck 30 or 40 feet after defendant's arrest and found no mechanical problems. Robertson also testified that when he interviewed Charlotte P. shortly after the crime, she said defendant told her on the telephone he had parked behind Shakey's to drink; he also said Miller had knives and he himself had a knife. Finally, Robertson testified that in defendant's detailed account of the stabbing he had never said he saw a knife in Miller's hand, but only on the ground.

Fred Trask, an acquaintance of Miller, testified that Miller told him someone had taken funds out of Miller's account without permission. Trask denied ever telling anyone that Miller was going to get S.P. or Charlotte P.

Miller's parole agent testified that Miller and defendant were in Deuel Vocational Institute at the same time for three weeks in January and February 2000, but were housed in different wings.

(C042286 opinion at 1-6.)

/////

/////

_____

[6] Defendant testified he wrote these notes on January 8, 2000, after Miller made the offer to pay him for killing Charlotte P. and S.P.

III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

IV.  ANALYSIS OF PETITIONER'S CLAIMS

A.      FALSE OR MISLEADING TESTIMONY

Petitioner alleges that parole officer Mills falsely testified that petitioner and Miller were never housed in the same wing during the time they were incarcerated at Dual Vocation Institute (DVI), a facility of the California Department of Corrections.  (Second Amended Petition at 19.)  Petitioner had previously testified that Miller approached him while they were housed in the same wing at DVI and offered him $3000 and a Harley Davidson motorcycle to "take care of" Charlotte P. and S.P.  (Second Amended Petition at 19.)  In closing argument, the prosecutor argued that petitioner was lying, and suggested that the jury disregard

1    all of petitioner's testimony due to the discrepancy between petitioner's testimony and Mills'

2    testimony regarding whether petitioner and Miller were ever housed in the same wing at DVI.

3    (Second Amended Petition at 19-20.)

4            Petitioner alleges that, during jury deliberations, his counsel approached the

5    prosecutor and informed him that Mills' testimony was false.  (Second Amended Petition at 20.)

6    The prosecutor responded that he believed Mills over petitioner, and the discrepancy was not

7    investigated further nor the record corrected.  (Second Amended Petition at 20.)  Petitioner has

8    submitted a declaration from Daniel Vasquez, a former official of the California Department of

9    Corrections, demonstrating that he and Miller were indeed housed in the same wing at DVI for

10   one day, on January 24, 2000.  (Second Amended Petition at 20.)  Petitioner asserts his due

11   process rights were violated when Mills' gave false or misleading testimony impeaching his

12   credibility and casting doubt upon his defense theory that he killed Miller to protect Charlotte P.

13   and S.P.  (Second Amended Petition at 18.)

14           A conviction obtained using knowingly perjured testimony violates due process

15   (*Mooney v. Holohan*, 294 U.S. 103, 112 (1935)), and "must be set aside if there is any reasonable

16   likelihood that the false testimony could have affected the jury's verdict."  *United States v.*

17   *Bagley*, 473 U.S. 667, 680 n.9 (1985); *see also Morales v. Woodford*, 388 F.3d 1159, 1179 (9th

18   Cir. 2004) ("The due process requirement voids a conviction where the false evidence is 'known

19   to be such by representatives of the State.'") (*quoting Napue v. Illinois*, 360 U.S. 264, 269

20   (1959)).  Thus, there are two components to establishing a claim for relief based on the

21   introduction of perjured testimony at trial.  First, the testimony must have been false.  *Jackson v.*

22   *Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008).  Second, a petitioner must demonstrate that the

23   prosecution actually knew or should have known that the testimony was false.  *Id.*; s*ee also*

24   *Morales v. Woodford*, 336 F.3d at 1151, 1152 ("The essence of the due process violation is

25   misconduct by the government, not merely perjury by a witness.") (*citing Napue*, 360 U.S. at

26   491-92) (overruled on other grounds).  "Mere speculation" is not sufficient to demonstrate these

1    requirements. *See United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991).

2            Mills' testimony that petitioner and Miller were never housed in the same wing at

3    DVI was based on custody records from DVI which, according to former Warden Vasquez'

4    declaration, actually show that they were housed in the same wing for one day. (Second

5    Amended Petition at 19.)  Although petitioner alleges that his counsel notified the prosecutor that

6    Mills gave inaccurate testimony, the prosecutor indicated that he believed Mills rather than

7    petitioner. (Second Amended Petition at 20.)

8            Petitioner has no evidence, only speculation, that the prosecutor knew or should

9    have known that Mills' testimony was inaccurate at the time it was given.  Petitioner admits that

10   his own attorney was unable to discern from the custody records that he and Miller were housed

11   in the same wing for one day. (Second Amended Petition at 20.)  Mills' testified that he was

12   trained to use the custody records of the California Department of Corrections in the course of

13   his employment as a parole officer (RT at 487-88[7]), thus it was reasonable for the prosecutor to

14   rely on his interpretation of the records.  It likely was not apparent to the prosecutor, just as it was

15   not apparent to petitioner's attorney, that Mills' interpretation of the records was inaccurate.

16           In any event, there is no reasonable likelihood that the alleged false or misleading

17   testimony affected the verdict or overall fairness of petitioner's trial.  Petitioner's defense theory

18   was that he killed Miller to protect Charlotte P. and S.P. (Second Amended Petition at 18.)  This

19   would be an "imperfect defense of others" defense under California law.  *See In re Christian S.*,

20   7 Cal.4th 768 (1994).  In order to succeed with this defense, demonstrating fear of future harm to

21   others is not sufficient; the peril must be immediate and present and not prospective or even in

22   the near future.  *In re Christian S.*, 7 Cal.4th at 783 ("fear of future harm- no matter how great

23   the fear and no matter how great the likelihood of harm- will not suffice [to show imperfect self-

24   defense]"); *People v. Randle*, 35 Cal.4th 987, 995-96 (same true of imperfect defense of others).

25   _____

26           [7] Reporter's Transcript on Appeal is lodged in this record as document 15 (12/11/07).

It is undisputed that petitioner killed Miller and also undisputed that Charlotte P. and S.P. were nowhere nearby at the time of Miller's death.  The danger to Charlotte P. and S.P. was not immediate and present, but rather, was in the near future, at best.  Imperfect defense of others was thus an impossible defense, and the attack on petitioner's credibility in asserting the impossible defense inconsequential.  For all these reasons, petitioner's claim regarding the prosecutor's use of false or misleading testimony should be denied.

B.      WITNESS COACHING

Petitioner alleges that the prosecutor violated his right to a fair trial by "coaching witnesses" including Sergeant Wilson, Marty Roephler, and James Campbell.  (Second Amended Petition at 21.)

First, petitioner alleges that the prosecutor coached Sergeant Wilson to volunteer testimony regarding petitioner's criminal history (Second Amended Petition at 21-22).  The particular portion of the direct examination went as follows:

> Q: During the conversation of, your conversation [with petitioner], did you explain the difference between a first and second degree murder?
>
> A: Yes, I did.
>
> Q: Did you ask for his side of the story?
>
> A: Yes, I did.
>
> Q: What was his response?
>
> A: He indicated his reasoning.  So I can clarify the question, his entire response to my question?
>
> Q: Yes.
>
> A: Upon explaining the difference between first degree and second degree murder Mr. Skains indicated he really didn't care because of his past history, criminal history.  We went on to discuss the reasoning for why the incident occurred behind Shakey's.  Mr. Skains began to explain a reason for why he did what he did.

(RT at 152-53.)

1    With respect to witnesses Roephler and Campbell, petitioner points to different

2    words used in their initial statements to police and their testimony given at trial.  (Second

3    Amended Petition at 22.)  Witness Roephler stated to police that the altercation appeared to be a

4    "drunken brawl," while at trial, he indicated that one person was the aggressor and the other

5    yelled "stop."  (Second Amended Petition at 22.)  Petitioner alleges that witness Campbell

6    changed his statement regarding a knife being missing from his home and alleges that Campbell

7    was coached to testify that petitioner had not been drinking that day.  (Second Amended Petition

8    at 22.)

9    Inconsistencies are not uncommon when witnesses testify at trial.  Minor

10   inconsistencies do not equal untruthfulness.  *See Allen v. Woodford*, 395 F.3d 979 (9th Cir.

11   2005); *Price v. Johnston*, 334 U.S. 266, 287 (1948) ("it may well be that the witness' subsequent

12   [inconsistent] statements were true..." ).  The presentation of a witness' contradictory testimony

13   is not improper absent the prosecutor's knowledge that the testimony is false.  *United States v.*

14   *Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993).  Other than pointing out that these

15   inconsistencies were helpful to the prosecution's case (Traverse at 18), petitioner provides no

16   support for his assertion that the testimony was the result of improper "coaching" by the

17   prosecutor.

18   Moreover, petitioner cites no authority in support of his claim that witness

19   "coaching" constitutes a violation of federal law.  (Second Amended Petition at 22.)  It is, of

20   course, proper for an attorney to meet with a witness in preparation for trial.  A thorough search

21   reveals no Supreme Court or Ninth Circuit precedent on the constitutional boundaries of witness

22   preparation.  There appear to be no clearly established standards for evaluating a prosecutor's

23   "coaching" of witness testimony, assuming of course that the testimony is not perjured.

24   Petitioner does not allege, as in the previous claim, that the testimony was false.  The standard of

25   review for a claim of prosecutor misconduct on a writ of habeas corpus is "the narrow one of due

26   process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Given the lack of precedent,

1  petitioner's vague accusations regarding the coaching of witnesses do not demonstrate a due

2  process violation.

3        C.      NON-DISCLOSURE OF IMPEACHMENT EVIDENCE

4        Petitioner claims that the prosecutor was considering filing extortion charges

5  against witness Mark Phelps for demanding payment for the return of shopping carts taken from

6  a grocery store.  (Second Amended Petition at 22.)  Petitioner alleges that charges were not filed

7  against Phelps in exchange for his testimony against petitioner.  (Second Amended Petition at

8  22.)  Petitioner asserts that the prosecutor failed to disclose this fact as well as the fact that

9  Phelps was involved in a physical altercation with Charlotte P.'s juvenile son shortly before

10  trial.[8]  (Second Amended Petition at 22.)  Petitioner alleges that the non-disclosure of this

11  impeachment information about witness Phelps violated his right to due process and a fair trial

12  under *Brady v. Maryland*, 373 U.S. 83 (1963).

13        In *Brady v. Maryland*, the United States Supreme Court held that the suppression

14  before trial of requested evidence favorable to an accused violates due process where the

15  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

16  the prosecution.  373 U.S. 83  (1963).  The *Brady* duty to disclose has been extended to include

17  impeachment evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Plaintiff's *Brady*

18  claim based on impeachment evidence against Phelps, however, fails for the reasons that follow.

19  */////*

---

20

21     [8] It appears, however, that defense counsel was aware of the alleged altercation.  The following exchange took place, on the record:

22        Prosecutor:  There is an unrelated allegation Mr. Phelps had thrown a rock at one of the

23        parties listed as a potential witness for the defense.  I ask that any evidence regarding an altercation regarding Mr. Phelps and any of the defense witnesses be discussed before the

24        presentation of that evidence...

25        Petitioner's counsel:  I think it would be appropriate ... and I will not include that in my opening statement.

26  (RT at 15-16.)

1    First, petitioner has failed to make any showing in support of his allegations that

2 the prosecutor's office was considering filing charges against Phelps, or that charges were not

3 filed in exchange for Phelps' testimony.  Petitioner's allegations are mere speculation which

4 cannot constitute a basis for relief in this court.  *See generally Phillips v. Woodford*, 267 F.3d

5 966, 987 (9th Cir. 2001) (petitioner not allowed to explore through discovery similar *Brady* claim

6 that district court characterized as "mere suppositions").

7    Further, even if true, there was no *Brady* violation because the impeachment

8 information about Phelps was not material.  In the *Brady* context, "evidence is material only if

9 there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

10 the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  "The question is not

11 whether the defendant would more likely than not have received a different verdict with the

12 evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

13 verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The proper focus is

14 whether the net effect of the undisclosed evidence undermined the outcome of the trial.  *Id*. at

15 421, 436-37; *see also United States v. Sarno*, 73 F.3d 1470, 1506-07 (9th Cir. 1995) (cumulative

16 weight of undisclosed statements of eight witnesses "tugs at loose threads hanging from the

17 margins of the Government's case, but in no way challenges the bulk of the evidence on which

18 the convictions rest"); *Hendricks v. Zenon*, 993 F.2d 664, 674 (9th Cir. 1993) (withheld evidence

19 not material where evidence of defendant's guilt was "overwhelming").

20    Respondent persuasively argues that Phelps' testimony did little to advance the

21 prosecution's case and nothing to undermine the defense.  Phelps testified that petitioner

22 appeared in bloody clothes shortly after the murder in possession of a hunting knife and stated he

23 had killed someone.  (RT at 132-147.)  That petitioner killed Miller was undisputed at trial.

24 Petitioner's defense was premised on self-defense and defense of others.  Phelps was not an

25 eyewitness to the murder.  Evidence of petitioner's guilt, however, was strong.  Eyewitness

26 Roephler saw petitioner striking Miller, who was backing away, asking petitioner to stop.

15

1  (C042286 opinion at 3.)  Roephler testified that Miller never swung at petitioner.  (C042286

2  opinion at 3.)  Miller suffered multiple stab wounds and blunt force injuries while petitioner had

3  none.  (C042286 opinion at 4; RT at 163-64.)  The net effect of the alleged undisclosed evidence

4  does not  challenge the bulk of the evidence on which petitioner's conviction rests.  Nor does it

5  undermine confidence in the verdict.  Petitioner received a fair trial and his speculative claim

6  regarding undisclosed exculpatory evidence should be denied.

7          D.       PROSECUTOR'S PRE-TRIAL STATEMENTS TO THE PRESS

8          Petitioner claims he was denied a fair trial when the prosecutor made misleading

9  and prejudicial statements to the press before trial.  (Second Amended Petition at 23.)  The

10  statements at issue were (1) that petitioner had a prior conviction for forcible child molestation,

11  when in fact his prior conviction was for oral copulation of a minor[9]; and (2) that the victim was

12  stabbed 21 times, whereas evidence at trial established that the victim had 16 stab wounds in

13  addition to six blunt-force injuries on his body.  (Second Amended Petition at 23; C042286

14  opinion at 2.)

15          The standard of review for prosecutorial misconduct is "the narrow one of due

16  process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  According to the Supreme Court,

17  "the touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the

18  fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219

19  (1982).  A federal court sitting in habeas corpus must distinguish between "ordinary error of a

20  prosecutor and that sort of egregious misconduct" that "so infected the trial with unfairness as to

21  make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S.

22  637, 643, 47-48 (1974).

23  /////

24 _____

25      [9]  The following correction ran in the same paper two weeks later: "Although prosecutors
initially claimed that one of his prior crimes was for child molestation, Skains contends it
actually involved consensual sex when he was twenty with a fifteen-year-old girlfriend, with
26  whom he subsequently had two children."  (Second Amended Petition at Exhibit F.)

The prosecutor's pretrial statements were inaccurate and arguably more prejudicial (though only slightly) than the true facts about petitioner's criminal history and the offense.  The statements did not, however, deprive petitioner of his due process right to a fair trial.  The newspaper article containing the statements was published on August 10, 2000, a full year and four months before petitioner's jury was selected.  (CT at 41-42, 86.[10])  The significant gap in time before commencement of trial diminished any prejudicial effect of the prosecutor's mis-statements.  *See Murphy v. Florida*, 421 U.S. 794, 802-03 (1975) (noting that the newspaper articles at issue ran seven months before trial in assessing whether pretrial publicity prejudiced defendant, and concluding that petitioner received a fair trial).[11]  In addition, the jury was properly admonished at trial to find the facts for themselves based only on the evidence received at trial.  (RT at 494.)  It is presumed that the jury followed these instructions, as nothing in the record suggests otherwise.  *See Richards v. Marsh*, 481 U.S. 200, 206 (1987) (there is an "almost invariable assumption of the law that jurors follow their instructions").

Petitioner supports his claim of prejudice with citations to *Shepard v. Maxwell*, 384 U.S. 333 (1966), and *Rideau v. Louisiana*, 373 U.S. 723 (1963), two United States Supreme Court cases examining intense pretrial publicity where motions for change of venue were denied.  These cases do not support petitioner's claim for the following reasons.

First, petitioner did not have a motion for change of venue based on prejudicial pretrial publicity denied by the trial court as did the defendants in those cases.  *Shepard*, 384 U.S. at 348; *Rideau*, 373 U.S. at 724.  Second, petitioner's allegations do not come close to demonstrating the intensity of pretrial publicity or the prejudicial effect that occurred in *Shepard* and *Rideau*.  *See Shepard*, 384 U.S. at 344-45 (describing "intense" pretrial publicity including

---

[10] Clerk's Transcript is lodged in this record as document 16 (12/11/07).

[11] Petitioner's counsel alleges in the traverse that there was ongoing media coverage of the case up to and during the trial.  There are no allegations, however, that the prosecutor had any involvement in any media coverage other than the August 10, 2000 newspaper article.

17

multiple newspaper articles and television broadcasts that continued unabated for the nine week

trial during which "jurors were constantly exposed to news media" and "their massive coverage

of the trial"); *Rideau*, 373 U.S at 724-26 (reversing conviction where the petitioner's videotaped

confession had been broadcast multiple times in the community prior to trial). Finally, review of

the record does not reveal, nor has petitioner attempted to demonstrate, that any jurors were

aware of the prosecutor's statements or, if they were, that they were unable to lay aside their prior

impressions and render a verdict based solely on the evidence presented in court.

        The prosecutor's misstatements to the media made months before trial were not

the "sort of egregious misconduct... amount[ing] to a denial of constitutional due process."

*Donnelly*, 416 U.S. at 647-48. Petitioner received a fair trial despite the two inaccurate

statements published sixteen months prior to commencement of his trial.

        E.      JUDICIAL BIAS

        Petitioner alleges that the trial judge was biased due to a conflict of interest.

(Second Amended Petition at 23.) A criminal defendant has a due process right to a fair and

impartial judge. *In re Murchison*, 349 U.S. 133, 136 (1955). Judicial bias may be shown by

demonstrating the judge's actual bias, or by showing that the judge had an incentive to be biased

sufficiently strong to overcome the presumption of judicial integrity (i.e., likely bias). *See*

*Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994). "Supreme Court precedent reveals only three

circumstances in which an appearance of bias- as opposed to evidence of actual bias- necessitates

recusal." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007). These circumstances are (1)

when the judge has a direct, personal, substantial pecuniary interest in reaching a particular

conclusion; (2) when the judge becomes embroiled in a running, bitter controversy with one of

the litigants, or (3) when the judge acts as part of the accusatory process. *Id*.

        On habeas corpus review, the relevant inquiry is not whether the trial judge

committed judicial misconduct, but rather, "whether the state trial judge's behavior rendered the

trial so fundamentally unfair as to violate federal due process under the United States

Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). Here, petitioner has not offered sufficient evidence to support such a finding.

Petitioner advances three allegations to support his claim of actual or likely bias: (1) the trial judge was publicly endorsed, and financially supported, by the District Attorney's office in his campaign for the bench; (2) the trial judge refused to admit evidence that (former) Deputy District Attorney Reilly failed to seek an arrest warrant for Kenneth Miller, because of the judge's "personal relationship" with Reilly; (3) the trial judge ruled for the prosecution more often than for the defense and denied petitioner's post-trial motions; and (4) the trial judge signed a pre-sentence report which included incorrect information regarding petitioner's criminal history. (Second Amended Petition at 23-24.) These allegations do not show actual bias on the part of the trial judge, nor any of the circumstances that can support a finding of likely bias under Supreme Court precedent as set forth by the Ninth Circuit in *Crater*, 491 F.3d at 1131.

The trial judge's alleged receipt of financial support from the District Attorney's office does not constitute "a direct, personal, substantial pecuniary interest" in reaching a conclusion against petitioner's interest. Petitioner's attempts to demonstrate that the trial judge's evidentiary rulings show bias also fail because the allegations are completely speculative. In the words of the Supreme Court,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance on an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required...

*Liteky v. Unites States*, 510 U.S. 540, 555 (1994) (internal citation omitted). Finally, petitioner does not demonstrate how bias is shown by the trial judge's acceptance of a pre-sentence report that allegedly contained inaccurate information. The second amended petition does not identify the so-called inaccurate information or explain how the pre-sentence report was incorrect. At sentencing, the trial judge indicated that he had read, considered, and signed the report and

1 supplemental report.  (RT at 642.)  Neither petitioner nor counsel objected to use of the report or

2 brought any inaccurate information contained therein to the judge's attention, despite having

3 ample opportunity to do so.  (RT at 642-46.)

4       Upon the record of this case, there appears no actual or likely bias on the part of

5 the trial judge.  Petitioner has failed to demonstrate that judicial bias rendered his trial so

6 fundamentally unfair as to violate due process.

7       F.     FIFTH AMENDMENT RIGHT TO REFUSE TO TESTIFY

8       At trial, petitioner sought to introduce as evidence a number of handwritten

9 letters he wrote to Charlotte P. warning her about Kenneth Miller.  (Second Amended Petition at

10 24.)  Petitioner intended to use the letters to demonstrate that he killed Miller to prevent what he

11 believed to be an imminent lethal threat to Charlotte P. and her daughter S.P.  (Second Amended

12 Petition at 24-25.)  The letters were the subject of a motion in limine by the prosecution.  (RT at

13 23.)  The trial judge ruled the relevant portions admissible but held that "for those to come in it

14 will be necessary for [petitioner] to testify to get over the hearsay objection..."  (RT at 23.)

15 Petitioner waived his Fifth Amendment rights at a hearing outside the presence of the jury (RT at

16 355-56) and testified at trial.  (RT at 357-413.)

17       A criminal defendant has a fundamental right to refuse to testify under the Fifth

18 Amendment.  Petitioner alleges that he was forced to testify and submit to cross-examination at

19 trial in order to admit evidence he believed to be crucial to his defense.  (Second Amended

20 Petition at 25.)  Petitioner argues that he should have been allowed to lay a proper foundation for

21 the letters through the testimony of their recipient, Charlotte P., who was familiar with his

22 handwriting.  (Second Amended Petition at 25.)

23       Respondent counters that the trial court's ruling, regardless of whether it was

24 correct, did not constitute compulsion within the meaning of the Fifth Amendment.  The

25 argument is persuasive.  As the Ninth Circuit has stated,

26 ////

> [t]he fifth amendment privilege against self-incrimination applies, for example, to prosecution comments on a defendant's failure to testify, *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), and coercive police custodial interrogation, *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), not a defendant's own subjective perception of what constitutes a proper trial strategy.

*Unites States v. Perkins*, 937 F.2d 1397, 1405 (9th Cir. 1991).

Petitioner made a tactical decision to testify in light of all the circumstances of his case. He further chose to testify on matters beyond the scope of the letters he wrote to Charlotte P. (RT at 357-413.), exposing himself to a wide scope of cross-examination. Even if motivated solely by the desire to introduce what he believed to be crucial defense evidence, petitioner's decision to testify was his own; he was not compelled. *See Williams v. Florida*, 399 U.S. 78, 84 (1970) (a criminal defendant's "dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against self-incrimination"); *see also United States v. Burreson*, 643 F.2d 1344, 1349 (9th cir. 1981) (holding that defendants' testimony was not "compelled" even though it was motivated by a desire to respond to evidence they argued was erroneously admitted against them).[12]

Before he testified, petitioner gave a thorough waiver affirming he was aware that he had a constitutional right to refuse to testify and that the decision was his and his alone to make. (RT at 355-56.) That he felt his decision was "compelled" by the circumstances of his

---

[12] Petitioner argues in his traverse that *Williams* and *Burreson* are distinguishable from this case. Indeed, *Williams* and *Burreson* dealt with different scenarios than that presented by petitioner: *Williams* dealt with a rule requiring a defendant to provide notice of an alibi witness, which in turn furnished the State with information useful in convicting him; in *Burreson*, the defendant felt compelled to take the stand to "explain away" improperly admitted prosecution evidence. *Williams* at 82-83; *Burreson* at 1349-50. Petitioner argues that the trial judge's ruling in this case was different because it was *defense* evidence he wanted to admit and because it "forced him to testify at trial, which falls squarely violated [sic] his right to remain silent under the Fifth and Fourteenth Amendments." (Traverse at 27-28.) Petitioner provides no authority to support his conclusion that the trial court's evidentiary ruling implicated his constitutional right to refuse to testify. Although not factually identical to this case, *Williams* and *Burreson* support the conclusion that petitioner was not "compelled" to testify within the meaning of the Fifth Amendment even though the trial judge ruled he must testify in order to admit the evidence he believed to be crucial to his case.

1   case is of no constitutional moment.  Petitioner has failed to demonstrate that he was denied his

2   right to refuse to testify at trial.

3       G.      RIGHT TO PRESENT A COMPLETE DEFENSE

4           Petitioner alleges that he was denied his constitutional right to present a complete

5   defense when the trial court excluded certain evidence as cumulative.  (Second Amended Petition

6   at 27.)  The excluded evidence included (1) several handwritten letters from petitioner to

7   Charlotte P. and (2) the testimony of potential defense witness Jerry Bowen.  (Second Amended

8   Petition at 27, 32.)

9           Because a violation of state law does not ordinarily provide a basis for habeas

10   relief (*Estelle*, 502 U.S. at 67-68), the state court's evidentiary ruling, even if erroneous, is

11   grounds for federal habeas relief only if it rendered the state proceedings so fundamentally unfair

12   as to violate due process.  *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000), *cert. denied*, 532

13   U.S. 984 (2001); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999).  Criminal defendants

14   have a fundamental due process right, implicit in the Sixth Amendment, to present a defense.

15   *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690

16   (1986).  That right, however, is not unlimited.  *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir.

17   2002).  A state law justification for exclusion of evidence does not abridge a criminal defendant's

18   right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a

19   weighty interest of the accused."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane*,

20   476 U.S. at 689-91 (discussing the tension between the discretion of state courts to exclude

21   evidence at trial and the federal constitutional right to "present a complete defense").

22           When evidence in a state proceeding has been excluded pursuant to an evidentiary

23   law, the Ninth Circuit uses a balancing test:

24           In weighing the importance of evidence offered by a defendant
            against the state's interest in exclusion, the court should consider
25           the probative value of the evidence on the central issue; its
            reliability; whether it is capable of evaluation by the trier of fact;
26           whether it is the sole evidence on the issue or merely cumulative;

1    and whether it constitutes a major part of the attempted defense.  A
     court must also consider the purpose of the [evidentiary] rule; its
2    importance; how well the rule implements its purpose; and how
     well the purpose applies to the case at hand.  The court must give
3    due weight to the substantial state interest in preserving orderly
     trials, in judicial efficiency, and in excluding unreliable or
4    prejudicial evidence.

5    *Alcala v. Woodford*, 334 F.3d 862, 877 (9th cir. 2003) (quoting *Miller v. Stagner*, 757 F.2d 988,

6    994 (9th Cir. 1985)); *see also Perry v. Rushen*, 713 F.2d 1447, 1452-53 (9th Cir. 1983), *cert.*

7    *denied*, 469 U.S. 838 (1984).

8            1. Letter Evidence

9            Petitioner first argues that the trial court erred in excluding most of his

10   handwritten letters to Charlotte P. offered to support his "defense of others" theory of the case.

11   (Second Amended Petition at 27.)  Petitioner alleges that the letters were admissible to show his

12   state of mind, specifically, that he feared Miller would kill Charlotte P. and S.P.  (Second

13   Amended Petition at 27.)  Upon consideration of the prosecution's motion in limine, the trial

14   court allowed relevant passages from two letters to come in, but excluded similar excerpts in

15   several other letters as cumulative.  (Second Amended Petition at 27; RT at 23, 346.)

16           Applying the Ninth Circuit's balancing test set forth in *Alcala*, the fact that the

17   excluded letters were relevant to petitioner's state of mind and capable of examination by the

18   trier of fact is outweighed by their cumulative nature, considering the substantial amount of other

19   evidence presented on petitioner's state of mind.  As explained by the state appellate court:

20           the excerpts from defendant's letters which the jury heard did not
             stand alone.  As we have noted, he testified at length about why he
21           feared Miller's intent well before the date of his crime and
             continuing until that date.  The testimony of all three members of
22           the P. family (Charlotte, Clarence, and S.P.) corroborated
             defendant's testimony in that regard.  So did the testimony of
23           Detective Reichel as to what Charlotte and Clarence told him
             before the crime about Miller's threatening conduct.  Furthermore,
24           defendant's diary, found in his truck after the crime, contained
             entries dated January 8, 2000, which established Miller's purported
25           offer of hit-man employment and defendant's intent to warn
             Charlotte P. and S.P.  Thus, there was ample evidence before the
26           jury about the nature and duration of defendant's fear of Miller.

                                          23

1  (C042286 opinion at 19-20 (footnote omitted).)

2      Petitioner cites *DePetris v. Kuykendall*, 239 F.3d 1057, 1059 (9th Cir. 2001) and

3  *Greene v. Lambert*, 288 F.3d 1081, 1090-92 (9th Cir. 2002) in support of his argument that

4  exclusion of his letters prevented him from presenting a complete defense.  These cases are

5  distinguishable and do not support the claim.

6      In *DePetris v. Kuykendall*, the defendant shot and killed her husband while he was

7  asleep in bed.  239 F.3d at 1058.  The Ninth Circuit found a due process violation where the trial

8  court excluded journal entries of the deceased husband that supported the defendant's imperfect

9  self defense theory.  239 F.3d at 1062-63.  The journal contained the deceased's own handwritten

10  description of his physical abuse of his homosexual companion, his beating of his stepdaughter,

11  his rape of a friend's girlfriend, and numerous accounts of beating his first wife, including the

12  breaking of her eardrum.  *Id*. at 1060.  The trial court ruled that the journal *and all references to*

13  *it* were inadmissible.  *Id*. at 1061.  In finding a due process violation, the Ninth Circuit noted that

14  "[n]one of the other evidence adduced at trial could in any way make up for [the defendant's]

15  own testimony about her state of mind, or for [the deceased husband's handwritten corroboration

16  of it.]").  *Id*. at 1059.  Quite simply, the defendant was "prevented from testifying fully about why

17  she feared him so."  *Id*. at 1063.

18      In *Greene v. Lambert*, the trial court excluded all evidence from any witness,

19  including the defendant and the victim, that the defendant suffered from Dissociative Identity

20  Disorder (formerly referred to as Multiple Personality Disorder).  288 F.3d at 1090.  Again, the

21  Ninth Circuit found an error of constitutional dimension because the defendant was completely

22  prevented from presenting relevant evidence that went to her state of mind.  *Id*. at 1090-92.

23      In contrast, petitioner was permitted to testify fully and at length about why he

24  feared Miller in regard to the safety of Charlotte P. and S.P.  (C042286 opinion at 19.)  The

25  relevant portions of the excluded letters are set forth in the second amended petition.  (Second

26  Amended Petition at 27-30.)  Comparison of the excluded excerpts with the trial transcript shows

1   that petitioner was not prevented from testifying about or otherwise putting on evidence of the

2   information contained in the letters, i.e., the hit-man offer, his fear that Miller would harm or kill

3   the P. family, and his efforts for their safety.  (Second Amended Petition at 27-30.)  Even if the

4   letters were erroneously excluded as cumulative, petitioner did not suffer a constitutional error

5   because he was allowed to present ample other evidence of his state of mind.  *Cf. Gill v. Ayers*,

6   342 F.3d 911, 922 (9th cir. 2003) (due process was violated where excluded testimony was the

7   sole evidence related to defendant's only defense).

8              2.       Testimony of Jerry Bowen

9              Petitioner next argues that the trial court erred in excluding the testimony of Jerry

10  Bowen, who, according to the offer of proof, was going to recount "certain fears and concerns

11  that were expressed to him concerning Kenneth Miller... based on statements from the

12  defendant."  (RT at 338.)  The trial court excluded the evidence on grounds that it, too, was

13  cumulative.  The trial judge decided that Bowen's testimony would add little to what had already

14  been testified to by more than one person as to petitioner's concerns about Miller.  (RT at 338).

15             The Supreme Court case cited by petitioner in support of this argument,

16  *Washington v. Texas*, 388 U.S. 14 (1967),  is distinguishable.  In that case, the trial court

17  excluded the testimony of the petitioner's accomplice, who would have testified that petitioner

18  "pulled at him and tried to persuade him to leave, and that petitioner ran before [the fatal shot

19  was fired]".  *Id.* at 1922.  The excluded witness "was the only other person who knew exactly

20  who had fired the shotgun and whether petitioner had at the last minute attempted to prevent the

21  shooting."  *Id*.

22             In petitioner's case, on the other hand, testimony from Jerry Bowen that petitioner

23  feared Kenneth Miller would have been substantively similar to the testimony given by

24  petitioner, all three members of the P. family, and Detective Reichel.  (C042286 opinion at 20.)

25  As with the letter evidence, the exclusion of Bowen's testimony was not unconstitutional because

26  petitioner was allowed to present ample other evidence of his state of mind with respect to

1   Kenneth Miller.  Petitioner is not entitled to relief on his claim that he was prevented from

2   presenting a complete defense.

3              4.      Prejudice

4              Petitioner's claims regarding the trial court's exclusion of evidence also fail

5   because he did not suffer prejudice.  In federal habeas corpus proceedings, a court must assess

6   the prejudicial impact of constitutional error under the *Brecht v. Abrahamson* (507 U.S. 619

7   (1993)) standard of "substantial and injurious effect" on the jury's verdict.  *Fry v. Pliler*, 127 S.

8   Ct. 2321 (2007).  As discussed in subsection A, Charlotte P. and S.P. were not present at the time

9   petitioner killed Kenneth Miller.  Petitioner's defense that he killed Miller to protect them was an

10  impossible defense under California law because any threatened harm to them was prospective or

11  in the near future rather than immediate and present.  No amount of additional evidence as to

12  petitioner's state of mind could have changed this fact.

13  H.      TRIAL JUDGE'S STATEMENT THAT PETITIONER WAS IN CUSTODY

14             On the second day of trial, the judge made the following statements on the record

15  in the presence of the jury:

16             THE COURT:  Bring in the jury, Madam Clerk.

17             (WHEREUPON THE JURY ENTERED THE COURTROOM)

18             (FOLLOWING PROCEEDINGS IN THE PRESENCE OF THE JURY)

19             THE COURT:  We are convening on People versus Skains.  Mr.
             Skains is present in custody.  Mr. Foster for the Defense.  Mr.
20             Redelsperger for the People.  The record will reflect the jury is all
             present seated in their appropriate seats.
21

22  (RT at 414.)  Petitioner alleges that the judge implied his guilt and deprived him of a fair trial

23  when he stated that petitioner was present in custody.

24             "Though not articulated in the Constitution, the presumption of innocence is

25  considered a basic component of the right to a fair trial guaranteed by the Fourteenth

26  Amendment.  *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  To implement the presumption,

courts must be alert to factors that may undermine the fairness of the fact-finding process.  *Id.*
For example, a criminal defendant generally has the right to appear before the jury free from
shackles or other physical restraints.  *Illinois v. Allen*, 397 U.S. 337 (1970).  Similarly, "courts
have, with few exceptions, determined that an accused should not be compelled to go to trial in
prison or jail clothing."  *Estelle*, 425 U.S. at 504.  There is no United States Supreme Court or
Ninth Circuit precedent, however, that guarantees a criminal defendant that the jury will not be
informed of his custodial status.

Petitioner cites two Supreme Court cases in support of his claim: *Quercia v.
Unites States*, 289 U.S. 466 (1933) and *Glasser v. United States*, 315 U.S. 60 (1942).  Neither
decision has any bearing on the issue whether the right to a fair trial is violated when the jury is
informed of the defendant's custodial status.

On habeas corpus review, the question is whether the state trial judge's behavior
rendered the trial so fundamentally unfair as to violate due process.  *Duckett v. Godinez*, 67 F.3d
734, 740 (9th Cir. 1995).  As respondent asserts, most jurors would expect a defendant standing
trial for murder to be in custody.  (Answer at 58.)  In addition, the reference to petitioner's
custodial status was isolated and brief.  The trial judge's remark that petitioner was present in
custody did not deprive him of a fair trial.  Petitioner is not entitled to relief on this claim.

I.        INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Petitioner alleges that trial counsel rendered ineffective assistance of counsel in the
following ways:

(1) failed to cross examine Detective Robertson about the length of two knives
recovered from Miller's clothing;

(2) failed to obtain and review custody records from the Dual Vocational Institute
prior to trial;

(3) failed to interview witnesses;

(4) failed to object to the trial judge's comment that petitioner was present in
custody on the second day of trial;

(5) agreed to "water down" the facts in the case and gave up on petitioner's defense

(6) advised petitioner to testify at trial; and

(7) due to the trial court's evidentiary rulings, failed to present a complete defense.

(RT at 35-36.)

A showing of ineffective assistance of counsel has two components.  First it must be shown that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  After the acts or omissions that are alleged not to have been the result of reasonable professional judgment are identified, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  *Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel "exercised acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

The second factor required for a showing of ineffective assistance of counsel is actual prejudice caused by the deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

Many of petitioner's subclaims are vague, conclusory, or wholly unsupported.  He has failed to establish either prong required for a showing of ineffective assistance of counsel.  First, his allegations do not demonstrate that counsel's performance fell below an objective

1   standard of reasonableness.

2          Petitioner's first subclaim is that trial counsel failed to cross examine Detective

3   Robertson regarding the length of two knives recovered from Miller's clothing after his death.

4   (Second Amended Petition at 35.)  Detective Robertson testified that the knives found in Miller's

5   clothing had blade lengths of approximately 21/2 and 31/2 inches.  (RT at 157.)  Petitioner

6   alleges that the knives were actually 51/2 and 81/2 inches long, but does not provide any support

7   for his assertion.  Respondent points out that petitioner does not indicate whether he is referring

8   to the blade length or entire length of the knives.  (Second Amended Petition at 35.)  If the knives

9   measured 51/2 and 81/2 inches long, then the blade lengths may very well have been only 21/2

10  and 31/2 inches, respectively.  In any event, the significance of the length of the knives recovered

11  from Miller's clothing is not apparent.  Petitioner does not explain what he believes could have

12  been accomplished by cross-examination of Detective Robertson on this point.  Upon the record

13  of this case, counsel's failure to cross examine Detective Robertson about the length of the

14  knives was not unreasonable professional judgment.

15         Petitioner's second subclaim is that trial counsel failed to obtain and review

16  custody records from the Dual Vocational Institute prior to trial.  (Second Amended Petition at

17  35; Traverse at 33-34.)  Had he done so, petitioner argues, the testimony of parole officer Mills

18  could have been impeached.  Parole officer Mills testified that while petitioner and Miller were

19  incarcerated at DVI at the same time, they were never housed in the same wing.  Petitioner has

20  produced a declaration of a former official of the California Department of Corrections

21  demonstrating that they were in fact housed in the same wing at DVI for one day.  (See Section

22  A, supra.)  Petitioner argues that Mills' inaccurate testimony hurt his credibility in front of the

23  jury because he had testified that Miller offered to pay him to "take care of" Charlotte P. and S.P.

24  while the men were at DVI.  During closing arguments, the prosecutor questioned petitioner's

25  testimony in light of the fact that parole officer Mills testified that they were never housed in the

26  same wing.

1     Before the records were received by petitioner's counsel, an offer of proof was

2  made that the records would demonstrate that petitioner and Miller were both incarcerated at DVI

3  at the same time.  (RT at 339.)  The prosecutor indicated no dispute as to that fact.  (RT at 339.)

4  The record shows that petitioner's counsel issued a subpoena for these DVI records, however

5  they were not produced until the trial was well underway.  (RT at 339.)  It is not clear from the

6  record, nor set forth in the petition, when the DVI records were subpoenaed and whether they

7  could have been obtained by petitioner's counsel at an earlier time.  Upon the record of this case,

8  it does not appear that counsel's failure to obtain and examine the records prior to trial was

9  unreasonable professional judgment.

10     Petitioner's third subclaim is that trial counsel failed to interview several

11  individuals, including: (1) Shirley Landis, whom petitioner claims witnessed the stabbing; (2)

12  Marty Roephler, the eyewitness who testified at trial; (3) Renee Davis, whom petitioner claims

13  heard Miller threaten the P. family while at the Hideaway Bar; and (4) Elizabeth Shults, a

14  counselor to the P. family who could have testified that petitioner and the P. family feared Miller.

15  There is no rule that requires an attorney to interview all prospective witnesses.  *Bragg v. Galaza*,

16  242 F.3d 1082, 1088 (9th Cir. 2001).  It is not readily apparent, nor does petitioner explain, what

17  would have been obtained through pre-trial interviews of each of these individuals.  Accordingly,

18  it does not appear that counsel's professional judgment was unreasonable in allegedly failing to

19  interview them.

20     Petitioner's fourth subclaim is that trial counsel failed to object when the judge

21  stated in the presence of the jury that petitioner was present in custody.  Petitioner argues that the

22  comment implied his guilt in front of the jury.  (See subsection H, supra.)  Petitioner has not,

23  however, sufficiently demonstrated that his counsel's failure to object to the isolated and brief

24  comment was the result of unreasonable professional judgment.  For example, an objection to the

25  judge's comment would only have highlighted petitioner's custodial status for the jury.  Thus

26  counsel's failure to object, or decision not to object, is not a basis for an ineffective assistance of

1   counsel claim.

2          Petitioner claims in his fifth subclaim that counsel agreed to "water down" the

3   facts in his case and essentially "gave up" on the defense.  (Second Amended Petition at 36.)

4   Petitioner does not elaborate further.  He has provided no facts to justify his conclusion.  These

5   vague and conclusory allegations are insufficient to raise a cognizable claim of ineffective

6   assistance of counsel.  *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (conclusory

7   allegations that counsel provided ineffective assistance "fall far short of stating a valid

8   constitutional violation" (*citing James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *Boehme v.*

9   *Maxwell*, 423 F.2d 1056, 1058 (9th cir. 1970) ("[a]llegations of fact, rather than conclusions, are

10  required").

11          The sixth subclaim is that counsel "advised petitioner to testify at trial in order to

12  fill holes in the case caused by the trial judge's evidentiary ruling."  (Second Amended Petition at

13  36.)  Again, petitioner does not elaborate.  He does not explain how he believes his testimony

14  hurt his defense or why counsel should not have advised him to testify at trial.[13]  The ultimate

15  decision whether to testify rested with petitioner.  *United States v. Joelson*, 7 F.3d 174, 177 ( 9th

16  Cir. 1993).  He gave a waiver of his right to refuse to testify, indicating he understood the

17  decision was his and his alone to make.  (RT at 356.)  *See United States v. Sanchez-Cervantes*,

18  282 F.3d 664, 672 (2002) (petitioner voluntarily accepted counsel's advice to testify, which was

19  not objectively unreasonable).  The allegations in this subclaim, like those in the previous one,

20  are vague and conclusory.  *See Jones*, 66 F.3d at 204; *James*, 24 F.3d at 26; *Boehme*, 423 F.2d at

21  1058.

22          Petitioner claims in his seventh and final subclaim that counsel was ineffective

23  "due to the constraints placed upon trial counsel by the trial judge's rulings described in [claim

24  G]."  (Second Amended Petition at 36.)  Petitioner does not explain how the trial court's

25  ────────────

26          [13] In fact, in subsection (F), petitioner claims that was compelled by the circumstances of
his case to testify in his defense.

1  evidentiary rulings rendered counsel "ineffective."  None of the cases cited in the petition

2  advance his argument in any way.  A thorough search reveals no clearly established federal law

3  on an ineffective assistance of counsel claim that is based wholly on the evidentiary rulings of the

4  trial court.

5          Petitioner's subclaims fail to demonstrate, either individually or in combination,

6  that counsel's performance fell below an objective standard of reasonableness.  Moreover, there

7  was no prejudice resulting from any of the alleged errors committed by defense counsel.  As

8  discussed elsewhere herein, there was ample evidence to convict petitioner, including eyewitness

9  testimony, petitioner's own statements, and physical evidence.  Petitioner's asserted defense, that

10  he killed Miller in defense of others, was an impossible defense under California law.  There

11  appears no reasonable probability that the result of the proceeding would have been different

12  absent any or all of counsel's alleged errors.  Petitioner has failed to establish ineffective

13  assistance of counsel under the standard articulated in *Strickland v. Washington*, 466 U.S. 668

14  (1984).

15          J.      UNANIMOUS VERDICT/ JURY POLLING

16          Petitioner alleges that he was denied due process and the right to a unanimous jury

17  verdict when the trial judge disregarded inconsistent verdicts and failed to sufficiently poll the

18  jury regarding the discrepancy.  (Second Amended Petition at 36.)

19          The State of California requires a twelve person jury and a unanimous verdict in

20  felony trials.  Cal. Const., Art. I, §16; Code Civ. Proc., § 194; *People v. Superior Court*

21  *(Thomas)*, 67 Cal.2d 929, 932 (1967).  The Sixth and Fourteenth Amendments, however, neither

22  compel nor prohibit state requirements that jury verdicts be unanimous.  *Johnson v. Louisiana*,

23  406 U.S. 356, 359, 363 (1972); *Apodaca v. Oregon*, 406 U.S. 404, 411-12 (1972).  Petitioner

24  argues that the California rule requiring a unanimous verdict of twelve jurors in a criminal trial is

25  the source of a liberty interest protected by the Due Process Clause of the Fourteenth

26  Amendment.  (Traverse at 37.)  There is no need to address this argument, however, because the

record clearly demonstrates that petitioner was convicted of second degree murder by a unanimous jury.

At trial, the jury was instructed as to the elements of the charged offense of first degree murder, the lesser related offense of second degree murder, and the lesser related offense of voluntary manslaughter.  After some deliberation, the jury indicated it had reached a verdict.  (RT at 583.)  After reviewing the verdict, the judge noted that the jury had failed to mark the verdict form as to Count I, first degree murder.  The judge instructed the jury as follows:

> THE COURT: (Name Redacted), in reviewing the verdict form I'm going to ask if you would go back into the jury deliberation room. It's necessary to complete the form; that is to complete all of them, whether there's guilt or not guilty.
>
> THE FOREPERSON: We misunderstood the instructions.

(RT at 583.)  The jury returned to the deliberation room as instructed.

According to the trial judge, the initial verdict forms had been returned as follows: the second degree murder form was checked guilty, and the special allegation of use of a deadly weapon was found to be true.  (RT at 588.)  The remaining two verdict forms for first degree murder and voluntary manslaughter were both left blank.  (RT at 588.)

When the jury returned to the courtroom, they provided the following inconsistent verdict forms: (1) not guilty of first degree murder; (2) not guilty of first degree murder but guilty of second degree murder; (3) not guilty of first degree murder, second degree murder, or voluntary manslaughter; and (4) true as to the special allegation of use of a deadly weapon.  (RT at 584-85.)

Noticing the discrepancy in the verdict forms for second degree murder and voluntary manslaughter, the court then polled the jury individually as follows:

> THE COURT: Ladies and Gentlemen, I'm going to poll the jury individually and we'll start with juror number one, (Name Redacted).  (Name Redacted), as to Count I, we the jury in the above-entitled matter find the defendant Randy Joe Skains who had been charged with the crime of murder with premeditation of

33

malice aforethought, violation of 187(a) of the Penal Code, a felony, not guilty.  Please answer yes or no if that is your verdict.

JUROR ONE: Yes.

THE COURT: Next, Count I, lesser included offense is as follows: We, the people in the above-entitled matter, having unanimously found the defendant Randy Joe Skains not guilty of the crime of murder, violation of 187(a) of the Penal Code, a felony, do further find Randy Joe Skains to the lesser related charge of second degree murder violation of Section 189 of the Penal code, a felony, guilty as charged.  Is that your verdict?

JUROR ONE: Yes.

THE COURT: Dated and Signed.  Next as to the form of verdict special allegation: We, the jury in the above-entitled matter, further find the defendant Randy Joe Skains who has been charged with the special allegation of use of deadly weapon, a felony, in violation of Section 12022(b), to wit, a knife, true.  Is that your verdict?

JUROR ONE: Yes.

THE COURT: Now, CALJIC 8.75 provides that if you unanimously find the defendant not guilty of first degree murder but guilty of second degree murder your foreperson should sign and date the corresponding verdict forms.  Do not sign any other verdict forms as to that count.  The last form is Count I, lesser included offense.  That reads as follows: We, the jury in the above-entitled matter, having unanimously found the defendant not guilty of the crime of murder, violation of 187(a) of the Penal Code, a felony, and having unanimously found the defendant Randy Joe Skains not guilty of the crime of violation of murder 189 of the Penal Code, do further find Randy Joe Skains as to the lesser related charge of voluntary manslaughter, 192 of the Penal Code, a felony, and this is checked not guilty, dated and signed.  (Name Redacted) is this a mistake?

THE FOREPERSON: Yes, sir.  It is.

THE COURT: Is that your understanding (Name Redacted)?  Is this a mistake?

JUROR ONE: I'm not clear about that.  Is that saying we did not reach a verdict that the defendant is guilty of voluntary manslaughter?

THE COURT: The instruction as (Name Redacted) just affirmed requires that if you find unanimously that the defendant is not guilty of first degree murder but guilty of second degree murder

34

1   you don't have to sign the other verdict form.

2   JUROR ONE: Oh, okay.

3   THE COURT: Okay.  Now, let's go to [Juror Two]...

4   (RT at 591-93.)  The judge continued to poll the jurors individually.  Each juror affirmed that the

5   verdict was not guilty as to the crime of murder, guilty as to the lesser related charge of second

6   degree murder, and true as to the special allegation of use of a deadly weapon.  (RT at 593-607.)

7   Petitioner complains that the trial judge asked questions establishing the validity

8   of the second degree murder guilty verdict while ignoring the voluntary manslaughter verdict

9   form, which recited that petitioner was not guilty of murder, second degree murder, and

10  voluntary manslaughter.  (Second Amended Petition at 38-39.)   Petitioner speculates that proper

11  questioning may have revealed that the jury did not unanimously find petitioner's guilt for

12  second degree murder.  (Second Amended Petition at 39.)  Such speculation is not supported by

13  the record, because each juror endorsed the guilty verdict, had ample opportunity to repudiate it,

14  and never contradicted it.  (RT at 591-609.)  It appears the voluntary manslaughter verdict form

15  was mistakenly filled out only after the judge instructed the jury to return to the deliberation

16  room to "complete all of the [forms]."  (RT at 583.)

17  Next, petitioner complains that the judge "improperly pressured" Juror One when

18  he asked if the voluntary manslaughter verdict form was "a mistake."  (Second Amended Petition

19  at 39.)  Petitioner alleges that, absent the judge's improper question, the juror may have admitted

20  that he did not find petitioner guilty beyond a reasonable doubt.  (Second Amended Petition at

21  39.)  Again, the record does not support this supposition.  The test for jury coercion by a trial

22  judge is "whether in its context and under all the circumstances of this case the statement was

23  coercive."  *Marsh v. Cupp*, 536 F.2d 1287, 1290 (9th Cir. 1976).  Whether the comments and

24  conduct of a state trial judge infringe upon a defendant's due process rights turns on whether "the

25  trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in

26  favor of reaching unanimous decision."  *Locks v. Sumner*, 703 F.2d 403, 406 (9th cir. 1983).

This trial judge's inquiry was not designed to coerce Juror One into relinquishing his views in favor of reaching a unanimous decision; a unanimous decision had already been reached.  The judge was merely questioning the jury in the face of an apparent misunderstanding about the verdict forms.  Upon the record of this case, there is no indication that any juror did not find petitioner guilty of second degree murder beyond a reasonable doubt.

Finally, petitioner alleges that Juror One's admission that the jury misunderstood the instructions, combined with the inconsistent verdicts rendered, demonstrates that his right to a unanimous verdict was violated, because "a jury with even one member that does not understand the verdicts being rendered could not logically be unanimous as to those verdicts." (Second Amended Petition at 39.)  It was not the verdicts, however, that the jurors did not understand; it was the verdict forms and subsequent instructions given by the court.

The jury found petitioner guilty of second degree murder on the only verdict form that gave them the choice to do so.  It was only the verdict form purporting to find petitioner not guilty of *voluntary manslaughter* which also recites a finding of not guilty of second degree murder.  This verdict form was properly left blank when the verdict forms were initially returned; it was only after the judge instructed the jury to "complete all of the [forms]" that the jury mistakenly filled out the verdict form finding petitioner not guilty of voluntary manslaughter. Each juror subsequently endorsed the guilty verdict for second degree murder upon individual polling.  Upon the record of this case, there is no indication that the jury verdict was less than unanimous, and petitioner is not entitled to relief on this claim.

K.       PROSECUTORIAL BIAS

For his final claim, petitioner alleges that the District Attorney who prosecuted him had a prejudicial conflict of interest.  He further alleges within this claim that the court suppressed evidence of the District Attorney's negligence, depriving him of the right to present a complete defense.  (Second Amended Petition at 40.)

/////

36

1    Under the Due Process Clause of the United States Constitution, a criminal

2  defendant is entitled to an impartial prosecutor.  *Young v. United States ex rel. Vuitton et Fils*

3  *S.A.*, 481 U.S. 787, 814 (1987).  On two previous occasions, the Supreme Court has held that the

4  participation of an interested or biased prosecutor can implicate the fundamental fairness of the

5  trial itself.  *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Young*, 481 U.S. at 808 n.19.  At the

6  same time, "the standards of neutrality for prosecutors are not necessarily as stringent as those

7  applicable to judicial or quasi-judicial officers."  *Young*, 481 U.S. at 810.

8    Petitioner was prosecuted by Assistant District Attorney Brent Redelsperger from

9  the Butte County District Attorney's Office.  Petitioner alleges that Redelsperger had a personal

10  and professional interest in suppressing evidence central to petitioner's defense at trial.  (Second

11  Amended Petition at 40.)  Specifically, petitioner sought to introduce evidence and argument that

12  Butte County Deputy District Attorney James Reilly had failed to act on a January 2000 police

13  investigation and request for a warrant for the arrest of Miller.  (Second Amended Petition at 41.)

14  Petitioner believes the evidence was relevant to his state of mind at the time he killed Miller.

15  (Second Amended Petition at 41.)

16    Redelsperger filed a motion in limine to suppress the evidence regarding the

17  Miller arrest warrant.  Petitioner alleges that Redelsperger was motivated by personal and

18  professional interests to suppress the evidence at trial due to possible embarrassment that might

19  result to the District Attorney's Office.  (Second Amended Petition at 39.)  Respondent counters

20  that Redelsperger could not have been so motivated because the District Attorney's handling or

21  mishandling of the Miller arrest warrant had already been widely reported by the media before

22  and during trial.  (Answer at 71-72.)  Petitioner's own exhibit shows this to be true.  (Second

23  Amended Petition, Exhibit F.)

24    Petitioner's allegations also ignore the valid legal basis for Redelsperger's motion

25  in limine.  The most likely motivation for Redelsperger's desire to suppress the evidence was that

26  it was irrelevant and prejudicial to the prosecution's case.  Indeed, the trial judge ruled that

evidence of "what the District Attorney's Office did or did not do" could not come in as it would be more prejudicial than probative and would create an undue consumption of time, confuse the issues, and potentially mislead the jury.  (RT at 33.)  This evidentiary ruling did not render petitioner's trial so fundamentally unfair as to violate due process.  Accordingly, petitioner's combined claim of prosecutorial bias and violation of the right to present a complete defense is without merit.

## V.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 16, 2009.

*Charlene H. Sorrentino*

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE